UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80538-CIV-HURLEY

**RTG FURNITURE CORPORATION,**
     **plaintiff,**

vs.

**INDUSTRIAL RISK INSURERS,**
     **defendant.**
_____/

ORDER DENYING CROSS MOTIONS FOR
PARTIAL SUMMARY JUDGMENT [DE #65, 69],
VACATING BIFURCATION ORDER [DE # 88]
& DENYING MOTION TO STRIKE [DE# 90]

This is an insurance coverage dispute arising out of business interruption losses allegedly suffered by plaintiff RTG Furniture Corporation in 2004 as a result of Hurricanes Charley, Frances, and Jeanne ("the Hurricanes"). The case is currently before the court on plaintiff's motion for partial summary judgment [DE# 65] and defendant's motion for partial summary judgment [DE# 69]. Upon consideration of the motions, responses, replies, pertinent portions of the record and oral argument of the parties, the court enters the following order.

**I. Background**

Plaintiff RTG Furniture Corporation (RTG) owns and operates retail furniture stores and warehouses throughout the State of Florida. Defendant Industrial Risk Insurers (IRI) is an unincorporated association consisting of two members: (1) Employers Reinsurance Corporation and (2) Westport Insurance Corporation.

IRI is engaged in the business of selling insurance policies to businesses such as RTG, and in Ferurary/March 2004, IRI issued property insurance policy number 31-3-70168 to RTG covering

the policy period spanning December 31, 2003 to March 1, 2005 ("the Policy"). The Policy is an "all risk" policy, i.e. a policy which covers all risks of loss unless the risk is expressly excluded from coverage. It does not specifically exclude "windstorms," and hence covers loss and damage resulting from the peril of windstorms, including hurricanes.

RTG paid $1,257,000.00 in premium for the Policy, the terms of which were negotiated between IRI and insurance brokers Tomas Tio of Property Risk Services (Tio) and Ken Jacobs of Acordia Southeast Inc. (Jacobs), purportedly acting on behalf of RTG. There is a dispute between the parties as to whether Tio and Jacobs acted as RTG's actual or apparent agents in these negotiations.

According to IRI, when RTG's primary layer property insurance policy with Lexington Insurance Company was due to expire in December, 2003, Stuart Suls, on behalf of RTG, contacted Acordia Southeast Inc.(Ken Jacobs), to explore new insurance options for RTG. Acordia, in turn, retained Property Risk Services LC (Tomas Tio), a wholesale broker, to assist in placing the new coverages.

RTG did thereafter issue a formal "Broker of Record" letter in October, 2003 stating:

> Acordia Southeast, Inc. and Property Risk Services, LC are authorized to negotiate directly with any interested company with respect to modifications in existing insurance policies and in closing, changing, increasing or canceling insurance carried under temporary binders or cover notes.

However, RTG now disputes that it retained Jacobs or Tio to act as its agent in negotiating the language of the new IRI policy. It states that RTG retained Acordia only to act as its broker for purposes of obtaining quotes for insurance coverage. It claims that Tio was then retained by Acordia – not RTG – as a wholesale broker to assist Acordia in researching the coverages. While

RTG acknowledges that it had a Brokerage Services Agreement with Acordia (Jacobs), it denies having any contractual or agency relationship with Property Risk Services (Tio), and denies knowing anything about Tio's specific communications and negotiations with IRI until after the Hurricanes hit in the summer and fall of 2004.

Tio sought proposals for insurance from various underwriters, and, after receiving a proposal from IRI, began discussions with James Rumble, an underwriter at IRI. IRI claims that Tio then prepared a manuscript form with specifications which he submitted to IRI on behalf of RTG, while RTG disputes that Tio's insurance specifications were RTG's specifications, and disputes whether Tio even sent specifications to IRI with his manuscript form in the first place.

In his discussions with IRI and Lexington, Tio suggested and incorporated his own wording to the terms of prospective coverages. After analyzing and comparing insurance proposals then submitted by IRI and Lexington, Tio recommended to Acordia that IRI offered the better coverage option for RTG. By email dated December 17, 2003, Mary Ashley of Acordia then transmitted the IRI Proposal to RTG in care of Stuart Suls. By email dated December 24, 2003, Suls, in turn, instructed Ken Jacobs at Acordia to bind coverage for RTG with IRI.

At that juncture, IRI issued a Binder of Insurance for RTG (effective 12-31-03 through 2-29-04) which it forwarded to Tio for delivery to RTG. The Binder extended coverage subject to various deductibles, specifically including the following Named Storm Occurrence Deductible:

> **A. "Basic Deductible(s)**: $50,000 Property Damage and Time Element combined, except $100,000 Property Damage and Time Element Combined for Warehouses ... except where noted below:...
>
> **B. Named Storm Occurrence**: The amount to be deducted for each named Storm Occurrence shall be the sum of 5% of the one hundred (100%) combined PD Value and TE Value at all locations in Lee, Henry... Counties Florida and 3% in All other

Designated Wind Areas "where physical loss or damage occurs."

The Binder is remarkable, in that – unlike the Policy which ultimately issued – it specifically restricts application of the NSO Deductible to those locations "*where physical loss or damage occurs*," and it contains a definition for "Property Damage Value" and "Time Element Value:"

> For the purpose of the deductible provisions: (a) PD Value shall be the sum of the value of all covered property just immediately preceding the physical loss or damage. ... (b) TE Value shall be the sum of all Time Element values that would have been earned for the Location(s) where the physical loss or damage occurs, loss occurs, had there not been physical loss or damage.

In February 2004, IRI issued the Policy to RTG for the policy period covering December 31, 2003 to March 1, 2005.

On August 13, 2004, Hurricane Charley tracked across Florida. On September 4, 2004, Hurricane Frances tracked across Florida. On September 25, 2004, Hurricane Jeanne tracked across Florida.

RTG made claim under the Policy for business interruption losses caused by the Hurricanes, specifically claiming loss due to interruption of power and utilities, acts of civil authority, hindrance of ingress and egress and damage to dependent properties precipitated by the Hurricanes– all losses which it maintained "ensued" from the Hurricanes and therefore fell outside the play of the Policy's $5,000,000.00 "Named Storm Occurrence Deductible" (NSO Deductible):[1]

> **5. DEDUCTIBLE CLAUSE** - All losses, damages, or expenses arising out of any one occurrence shall be adjusted as one loss and from the amount of such adjusted loss shall be deducted the sum of $50,000 except as follows:
> ....
> d. As respects loss or damage in (sic) resulting from the peril of a Named Storm

---

[1] Because the National Weather Service named these storms, the losses caused by or resulting from each constitutes a "Named Storm Occurrence" under the Policy.

4

Occurrence, this Company shall not be liable for loss to any location covered hereunder unless such loss exceeds (5%) of the combined property damage and time element value .... In the event of loss involving two or more locations for which a claim is submitted, the applicable percentage Deducible herein shall apply jointly to such locations.  A minimum Deductible of $250,000 each occurrence and a maximum Deductible of $5,000,000 each occurrence shall apply. **This Deducible shall not apply to ensuing loss or damage not otherwise excluded herein.** [Emphasis supplied].

In addition to claiming coverage under the general "all risk" coverage extended by the Policy, RTG also claimed coverage under specific policy provisions for "time element coverage" and "consequential loss" set out at ¶ 19 and ¶ 47 of the Policy:

> **19.   Extensions of Time Element Coverage**: This Policy, subject to all its provisions and without increasing the amount of said policy, insures against loss resulting from damage to or destruction by the perils insured against, to:
>
> a) property of any supplier (of any tier) due to any accidental occurrence of incoming or outgoing services including but not limited to electricity, water, steam, gas, telephone, fuel or refrigeration services of the Inured.....
>
> d) the actual loss sustained for a period not to exceed sixty (60) consecutive days when, as a result of a peril insured against, access to real or personal property is prohibited by order of civil or military authority.
>
> e) the actual loss sustained for a period not to exceed (60) consecutive days when, as a result of a peril insured against, ingress or egress from real or personal property is thereby prevented or hindered irrespective of whether the property of the insured shall have been damaged......
>
> **47.   CONSEQUENTIAL LOSS** - This policy insures against consequential loss to the property insured caused by change of temperature or humidity or by interruption of any service including but not limited to power, heat, air conditioning, or refrigeration resulting from a peril insured against.

On June 18, 2007, RTG supplied IRI with proofs of loss and made claim for the following amounts:

- losses ensuing from Hurricane Charley        $2,214,221

5

- losses ensuing from Hurricane Frances        $6,923,148
- losses ensuing from Hurricane Jeanne         $3,260,018

IRI refused to pay RTG's claims, contending that the losses did not exceed the Policy's Named Storm Occurrence Deductible of $5 million per occurrence (i.e. per Hurricane).

This suit ensued. In its current complaint for declaratory judgment, RTG seeks declaration that that the NSO Deductible does not apply to its claimed business interruption losses because they are all "ensuing losses" within the meaning of the "ensuing loss" exception to the Deductible. Its theory here is that the concept of "ensuing" loss necessarily implies an element of indirect loss, and that its claimed losses here incorporate that element because they derive ***not*** from direct physical damage to the store location claiming the loss (e.g. business interruption due to facility damage or time lost making repairs to damaged property), but rather from intervening acts of civil authority, interrupted ingress/egress, power interruptions, etc. which interrupted business at store locations which did not suffer direct physical damage.

Alternatively, RTG argues that the NSO Deductible is void because it does not comply with the requirements of §627.701(4)(a), Florida Statutes (2007) governing publication of hurricane deductibles in property insurance policies. More specifically, RTG claims the Policy NSO Deductible is unenforceable because the Policy does not, on its face, include the following language in boldface type, no smaller than 18 points, as dictated by Florida Statute § 627.701(4)(a):

> **THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR HURRICANE LOSSES, WHICH MAY RESULT IN HIGH OUT- OF- POCKET EXPENSES TO YOU.**

IRI admits that the Policy does not contain the wording required by Fla. Stat. § 627.701(4); however, it contends that this does not void the NSO Deductible here because:(1) this statute has

6

no application where the language and terms of the deductible are supplied by the insured [as here, where it contends that Tio, as RTG's authorized agent, drafted and supplied the terms of the NSO Deductible]; and (2) even if the statute were applicable, IRI's noncompliance does not render the NSO Deductible void.

On the merits of RTG's coverage claim, IRI admits that certain provisions of the Policy cover "ensuing losses."  However, it contends that the NSO Deductible limits the amount of recovery available for such losses, and that the "ensuing loss" exception has no application here. Borrowing from a line of authorities interpreting "ensuing loss" exceptions to policy exclusions in property insurance policies, it argues that RTG's claimed losses are not "ensuing" because they are not wholly separate and distinct from loss caused by the peril (windstorm) which is subject to the Deductible.

The case is now before the court upon the parties' cross-motions for summary judgment on the applicability and validity of the Policy's NSO Deductible.

## II. Standard of Review

Summary judgment is appropriately entered only where the pleadings, discovery and disclosure materials on file show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Rule 56(c) Federal Rules of Civil Procedure.

An issue of fact is "material" if it is a legal element on the claim under the applicable substantive law which might affect the outcome of the case. *Allen v Tyson Foods, Inc*., 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* Thus, the basic issue before the court on motion for summary judgment is whether the evidence presents sufficient disagreement to require

submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. *Id.*

In ruling on summary judgment, the court must view the evidence and all reasonably available factual inferences in the light most favorable to the party opposing the motion. *Id.* If reasonable minds could differ on inferences arising from undisputed facts, the court should deny summary judgment. *Id.*

However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading," but rather must -- by affidavits or other competent evidence -- set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56 (c). The "mere scintilla" of evidence in support of the nonmoving party's position will not be sufficient; there must be enough evidence on which a jury could reasonably find for that party. *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

### III.  Analysis

#### A.  General Precepts of Policy Construction

Both parties acknowledge that the interpretation of an "ensuing loss" exception in the context of a property insurance policy deductible raises a question of first impression not only in Florida, but also nationwide. Before addressing the specific arguments and contrasting interpretations which the parties offer to guide the court's construction of this novel policy structure, the court first notes that Florida law governs the interpretation of this Policy. [2]

This follows because this court is bound to apply Florida's choice of law rules in determining

---

[2] IRI raises a threshold issue regarding choice of law, contending that because IRI issued the policy to Tomas Tio, RTG's purported broker, in New Jersey, the contract was delivered in New Jersey and New Jersey substantive law ought apply. It then contends the same construction of the Policy follows regardless of whether New Jersey or Florida law applies.

which state's law governs this case, and Florida chose of law rules mandate application of Florida law to a dispute over a contract to insure real property located within this state, without regard to application of the *lex loci* doctrine. *Great American E & S Ins. Co. v Sadiki*, 170 Fed. Appx. 632 (11th Cir. 2006)(*per curiam*); *Shapiro v Associated Int'l Ins. Co.* 899 F.2d 1116 (11th Cir. 1990).

Under Florida law, an insurance contract is to be construed in accordance with the plain language of the policy. *Siegle v Progressive Consumers Ins. Co.*, 819 So.2d 732 (Fla. 2002). The policy should be read as a whole, giving every provision its full meaning and operative effect. *Auto-Owners Ins. Co. v Anderson*, 756 So.2d 29 (Fla. 2000). That is, a single policy provision should not be considered in isolation, but rather, the contract shall be construed according to the entirety of its terms as set forth in the policy and as amplified by the policy application, endorsements or riders. *Swire Pac. Holdings Inc. v Zurich Ins. Co.*, 845 So.2d 161 (Fla. 2003); *U. S.B. Acquisition Co. v Stamm*, 660 So.2d 1075 (Fla. 4th DCA 1995), *rev. denied*, 670 So.2d 941 (Fla. 1996).

Where no ambiguity exists, an insurance policy shall be construed according to the plain language of the policy and it must be given effect as written. *Auto-Owners Ins. Co. v Anderson*, 756 So.2d 29, 33 (Fla. 2000). Conversely, where an ambiguity is found,[3] it must be interpreted liberally in favor of coverage and strictly against the insurer. *Florida v Allstate Ins. Co.*, 819 So.2d 740 (Fla. 2002). The rule requiring courts to resolve ambiguities in insurance contracts in favor of

---

[3] A policy is considered ambiguous when the language is subject to "more than one reasonable interpretation, one providing coverage and the [sic] another limiting coverage..." *Anderson*, 756 So.2d at 34. The lack of a definition of an operative term does not, by itself, however, create an ambiguity. *State Farm Fire & Cas. Co v CTC Development Corp.*, 720 So.2d 1072 (Fla. 1998). Nor does an ambiguity exist merely because the policy is complex and requires analysis for one to fully understand it. *State Farm Fire & Casualty Co. v Oliveras,* 441 So.2d 175 (Fla. 4th DCA 1983).

9

coverage is not a fundamental departure from established contract principles. Rather, it is one instance, albeit special and emphatic, of the widely recognized rule that resolves ambiguity in a contract against the contract's drafter. *American Home Products Corp v Mutual Ins. Co.* 565 F. Supp. 1485, 1492 (S.D.N.Y. 1983), *aff'd as modified*, 748 F.2d 760 (2d Cir. 1984). *See generally City of Homestead v Johnson*, 760 So.2d 80, 84 (Fla. 2000); *MacIntyre v Green's Pool Service, Inc.*, 347 So.2d 1081 (Fla. 3d DCA 1977).

      This principle, which flows under the doctrine of *contra preferentum,* is sensibly applied in the insurance contract context where the insurer has typically drafted the policy; however, it has no logical application where the insured is a sophisticated commercial entity which has participated in drafting of the policy. *Benjamin Moore & Co. v Aetna Cas. & Sur. Co.* 179 N. J. 87, 843 A.2d 1094 (N.J. 2004); *Fireman's Fund Ins. Co v Fibreboard Corp*. 182 Cal. App. 3d 462, 227 Cal. Rptr. 203, 206-07 (Cal. App. 1 Dist. 1986)(general rule of strict construction of policy against insurer was not applicable where both parties were large corporate entities, each represented by specialized insurance brokers or risk managers, who negotiated terms of insurance contracts); *Metpath, Inc. v Birmingham Fire Ins Co.* 86 A.D.2d 407, 449 N. Y. S. 2d 986, 989 (N. Y. A. D. 1 Dept. 1982).

### B. **Interpretation of NSO Deductible**

      Essentially, RTG argues that the concept of "ensuing" loss connotes indirect or "consequential" loss, and that the business interruption losses claimed here – which are not tied to business interruption caused by direct physical damage to the store locations making claim -- - clearly harbor this element of indirect or "consequential" loss that the "ensuing loss" exception to the NSO Deductible was intended to capture. To support and illustrate this refinement of the term, it references conventional dictionary usages which define "ensue" to mean "to follow as a

result or consequence," citing Webster's II New College Dictionary, p. 375, or "to follow in order; come afterward, especially in immediate succession, " citing Random House Unabridged Dictionary 983 (2d ed. 1993).

Thus, under RTG's interpretation, business interruption losses are "consequential" or "ensuing" if they are tied to store locations which *did not* suffer direct physical damage from the Hurricanes, while business interruption losses are not "consequential" or "ensuing" if they are tied to store locations which *did* suffer direct physical damage (e.g. business interruption precipitated by store closing due to damaged store or hurricane related repairs of damaged facility). Because all of its claimed business interruption in this case occurred at store locations which *did not* sustain direct physical damage to the store property, it urges that its claimed losses are "ensuing" within the meaning of the "ensuing loss " exception to the NSO Deductible, and that its claim is thus subject only to the general policy deductible of $50,000.00 per occurrence.

As extrinsic evidence of the parties' intent in this regard, it cites to the drafting history of the Policy, and in particular, the language employed in the preliminary insurance binder, which contained a named storm occurrence deductible expressly restricting its application to store locations suffering direct physical loss or damage. It also references custom and practice in the insurance industry, contending that percentage windstorm and hurricane deductible provisions customarily do not apply to extensions of time coverage which do not require physical loss or damage to insured property.

IRI, conversely, argues that RTG's strained reading of the word "ensuing" effectively invites the court to re-write the policy by supplying a "direct physical damage" restriction to operation of the NSO Deductible, in contravention of its clear and unambiguous terms. It emphasizes that the

11

NSO Deductible expressly applies to "[a]ll losses, damages or expenses" resulting from the peril of a named storm occurrence, and that "all" means "all" – i.e. it necessarily includes losses sustained at properties suffering direct physical damage as well as losses sustained at properties not suffering direct physical damage. Because the policy language at issue is clear and unambiguous in this regard, IRI argues that extrinsic evidence of the parties' intent is not properly considered in construing the language.

Further rejecting RTG's broad, dictionary-based construction of "ensuing loss," IRI instead advocates a narrow interpretation of this concept which draws from judicial gloss on "ensuing loss" clauses more typically found in property insurance policy exclusions. In this specialized context, courts generally recognize that a "resulting loss" or "ensuing loss" exception to a policy exclusion does not operate to resurrect coverage for the excluded loss, but rather works to reaffirm coverage for secondary, wholly separate and independent losses which arise out of an excluded peril. Under this line of authority, for example, the cost of repairing a building or property defect which is the product of an excluded loss is not properly captured under the concept of "ensuing loss" due to its linear connection to the excluded peril, [4] while, at the same time, if an excluded peril triggers

---

[4] *See e.g. Swire Pacific Holdings, Inc. v Zurich Ins. Co.,* 845 So.2d 161 (Fla. 2003), citing *Laquila Constr. Inc v Travelers Indem. Co.* 66 F. Supp. 2d 543, 544-45 (S.D.N.Y 1999)(where builder's risk policy contained exclusion for cost of making good faulty workmanship, with "ensuing loss" exception for physical damage resulting from such faulty workmanship, claim for cost of repairing defective concrete fell within exclusion); *aff'd* 216 F.3d 1072 (2d Cir. 2000)(unpub); *Schloss v Cincinnati Ins. Co.* 54 F. Supp. 2d 1090, 1094-96 (M D. Ala. 1999)(where homeowner insurance policy contained exclusion for loss caused by rot, and exclusion was subject to "ensuing loss" exception, the costs associated with repair rot damage were excluded), *aff'd* 211 F.3d 131 (11th Cir. 2000(unpub); *Allianz Ins Co v Impero*, 654 F. Supp. 16, 17-18 (E.D. Wash. 1986)(where builder's risk policy contained an exclusion for cost of making good faulty workmanship, but also contained "ensuing loss"exception, losses incurred in repair of defectively erected concrete wall were not covered as "ensuing loss").

another event which precipitates a separate, independent loss, coverage may be captured as an "ensuing loss" provided that the intervening event is itself a covered peril.[5]

Just as any broader reading of "ensuing loss" within the context of an exception to a policy exclusion would otherwise 'swallow' the exclusion, IRI argues that any broader reading of "ensuing loss" within the context of an exception to a policy deductible would lead to the absurd result of swallowing or eviscerating the deductible.

RTG argues that this analogy is misplaced, because the linguistic tension created by juxtaposition of an "ensuing loss" exception to a policy *exclusion* is not present when an "ensuing loss" exception is carved out of a policy *deductible.* That is, while this narrow gloss on "ensuing loss" might make sense when it modifies a policy exclusion as a matter of lexical logic - otherwise an excluded loss is converted to a covered loss merely by "ensuing" or following it, it is not justified where the concept of "ensuing loss" modifies a policy deductible – i.e. there is nothing illogical about allowing the ordinary, broader definition of "ensuing" to apply in defining the boundaries of a deductible which restricts the amount, as opposed to the existence or fact, of available coverage.

Noting that the Policy does not define "ensuing loss," that neither party is able to identify any case authority which exemplifies the use of this clause in a policy deductible, and that both sides offer plausible, reasonable interpretations of the term, the court concludes that the meaning of the term "ensuing loss" as used in the NSO Deductible is ambiguous. Moreover, the proper

---

[5] *Hanover New England Ins. Co v Smith*, 35 Mass. App. 417, 621 N.E. 2d 382 (Mass. App. Ct. 1993)(under homeowner policy which excluded loss "directly caused" by release of contaminants, but covered "ensuing losses" not otherwise excluded, policy did not extend coverage for property damage to rug and wood caused by heating oil which seeped into building structure from leaking furnace, but theoretically might extend coverage in event of fire caused by oil spill under "ensuing loss" exception).

interpretation of the clause is likely to turn, at least in part, on the inferences to be drawn from extrinsic evidence, including the disputed role of Tio in drafting the policy and agency issues which attend his participation in the policy negotiation process.

While the court does not consider extrinsic evidence when determining if the contract is ambiguous, because it has found the language of the Policy ambiguous here, extrinsic evidence can be considered to determine the intent of the parties and clarify the ambiguity. *Christensen v Metropolitan Life Ins*. Co. 542 F. Supp. 2d 935 (D. Minn. 2008); *Newin Corp v Hartford Accident & Indem. Co.*, 62 N.Y. 2d 916, 467 N. E. 2d 887, 479 N.Y.S.2d 3 (N. Y. 1984). Because the court further finds a genuine issue of material fact on the issue of the parties' intent, it mus deny both motions for summary judgment on construction of the NSO Deductible. [6]

### C.   Validity of NSO Deductible under §627.701(4)(a)

The court has carefully reviewed the parties' respective arguments on the effect of the defendant's acknowledged failure to comply with the policy publication requirements of §627.701(4)(a), Fla. Stat. (2007) Having done so, it is persuaded by the rationale of its sister court in *Chalfonte Condominium Apt. Association, Inc. v QBE Ins. Corp.,* 526 F. Supp. 2d 1251 (S. D.

---

[6] Ordinarily, as RTG points out, the court is obligated to resolve any arguable ambiguity in an insurance policy in favor of coverage. However, this rule of construction applies only where the insurance policy under consideration is drafted by the insurer. Where, as here, there is some evidence suggesting that a sophisticated insured had at least equal input into the drafting of the policy generally, and of the specific clause at issue, application of the doctrine of *contra preferentem* is doubtful. *See Standard & Poor's Corporation v Continental Casualty Co.*, 718 F. Supp. 1219 (S.D.N.Y. 1989), citing *Schering Corp v Home Ins. Co.* 712 F.2d 4, 10 n. 2 (2d Cir. 1983). *See also Benjamin Moore & Co. v Aetna Cas. & Sur. Co.* 179 N. J. 87 (2004); *St. Paul Fire & Marine Ins. Co . v Royal Ins. Co. Of America,* 1994 WL 167943 (S.D.N.Y. 1994)*; Fireman's Fund Ins. Co v Fibreboard Corp*. 227 Cal. Rptr. 203, 206-07 (Cal. Ct App. 1986); *Metpath, Inc. v Birmingham Fire Ins Co.* 449 NYS2d 986, 989 (NY App. Div. 1982).

Fla. 2007)(Middlebrooks, J.), and, following *Chalfonte*, holds that in the absence of an express penalty attached to this statute which prescribes the manner in which property insurers are to alert their insureds that the policy contains a separate hurricane deductible, the court is not at liberty to supply one. Therefore, IRI's conceded violation of this mandatory statute –via its entire failure to insert the required language in the Policy–does not void the NSO Deductible as a matter of law. RTG's motion for summary judgment on the basis of the asserted §627.701(4)(a) violation is accordingly denied.

### IV.  Conclusion

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1. Summary judgment is precluded by an ambiguity in the meaning of the term "ensuing loss" and the existence of genuine issues of material fact on the parties' intent respecting the meaning and intended operation of the "ensuing loss" exception to the Policy's NSO Deductible.

2. The plaintiff's motion for partial summary judgment [DE# 65] is **DENIED.**

3. The defendant's motion for partial summary judgment [DE# 69] is **DENIED**.

4. In light of the foregoing, the court's prior order bifurcating liability and damage issues for trial [DE# 88] is **VACATED.**  This case shall now proceed to trial on all remaining liability (coverage) and damage issues.

5. The stay on discovery of damage issues previously imposed in conjunction with the bifurcation order is likewise **VACATED**.  This case shall be removed from the October 2008 trial docket and continued to a later trial calendar by separate order of the court in order to permit completion of discovery on all issues.

5. The defendant's motion to strike Affidavit of Paul B. McCarthy [DE# 90] is **DENIED.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 9th day of October, 2008.

                                                                                              _____
                                                                                              Daniel T. K. Hurley
                                                                                              United States District Judge

cc.
All counsel